**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John W Chandler, | No. CV-20-00924-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Louis DeJoy, | |
| Defendant. | |

John Chandler ("Plaintiff") began working for the United States Postal Service ("USPS") as a City Letter Carrier in 1995.  Toward the end of 2011, Plaintiff began missing work due to mental and physical health issues.  Shortly thereafter, Plaintiff began receiving treatment for post-traumatic stress disorder ("PTSD").  After exhausting his leave under the Family Medical Leave Act ("FMLA"), Plaintiff continued to miss work, eventually accruing over two dozen "unscheduled" absences between November 2015 and March 2016.[1]  In May 2016, USPS terminated Plaintiff's employment because of his unscheduled absences.  Plaintiff then brought suit against Louis DeJoy, Postmaster General of the USPS ("Defendant"), alleging disability discrimination in violation of the Rehabilitation Act, among other claims.

Now pending before the Court is Defendant's motion for summary judgment.  (Doc. 77.)  For the following reasons, the motion is granted.

---

[1]     The USPS Employee and Labor Relations Manual ("ELM") defines unscheduled absences as "any absences from work that are not requested and approved in advance." (Doc. 77-2 at 24.)

**BACKGROUND**

I.    Factual Background

The background facts below are taken from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.  Additional facts bearing on the parties' specific summary judgment arguments are addressed in the Discussion portion of this order.

A.    **Plaintiff's Absences Between 2011 And 2014**

Plaintiff worked as a City Letter Carrier with USPS from 1995 until 2016 at the South Mountain Post Office in Phoenix, Arizona.  (Doc. 77-2 at 3 ¶ 3; Doc. 80-2 at 3 ¶ 3.)

In September 2011, Plaintiff began missing work at USPS, attributing his absences to his underlying health conditions.  (Doc. 80-18 at 66 ["Enclosed along with my FMLA form WH-380-E are copies of documentation for the periods I was absent for my FMLA Condition.   09/12/2011  through  09/20/2011,  10/06/2011  through  10/18/2011  and 10/25/2011  through  11/30/2011."]; *id.* at 71 ["John  missed  work  from  11/25/2011  to 11/30/2011 . . . ."].)

No later than December 2011, Plaintiff began seeking mental health treatment for PTSD.  (*Id.* at 2.)

In 2012, Plaintiff's absences from work continued.  (*Id.* at 69 [January 10, 2012 medical note: "John Chandler has informed us he was unable to work 1/3/12 – 1/9/12"]; *id.* at 57 [April 25, 2012 doctor's letter: "[Plaintiff] stated he had been unable to work since 2/1/12 secondary to severe depression"]; *id.* at 53 [October 12, 2012 letter from USPS noting Plaintiff's "incapacitation from work since September 7, 2012"].)

On April 10, 2012, Plaintiff received a letter advising him of a fact-finding hearing to discuss his absences.  (*Id.* at 62 ["Additionally I never heard from you (my scheduling supervisor) either by phone or by mail during this period until I received a notice of Fact Finding (April 10th) to be held on April 20th."].)

Throughout 2013 and 2014, Plaintiff continued to miss work because of his underlying  health  conditions.   (*Id.*  at  46  [July  2013  doctor's  letter:  "[It]  [i]s  my

understanding that you require a reason for why [Plaintiff] has missed multiple days at work from 3/11 through 6/20/13.  He has been under my care for posttraumatic stress disorder, mood and anxiety issues.  Also during this timeframe, I was adjusting his psychiatric medications, which sometimes caused side effects necessitating him missing work."]; *id.* at 29 [November 2013 doctor's letter: "Due to John Chandler's depression, high anxiety and emotional issues, please excuse him from work from 8-4-13 thru 11-6-13."]; *id.* at 22 [August 2014 doctor's letter: "Due to John Chandler's following symptoms: (ptsd, depression, high anxiety, insomnia, unable to concentrate, mood swings, hyper vigilance, agoraphobia, emotional issues, and inability to function in normal activities), he has been incapacitated and unable to perform his duties.  Please excuse him from work for the following days: 5-28-14 thru 8-18-14."]; *id.* at 18 [December 2014 doctor's letter: "Due to John Chandler's following symptoms: (ptsd, depression, high anxiety, insomnia, unable to concentrate, mood swings, hyper vigilance, agoraphobia, emotional issues, and inability to function in normal [activities]), he has been incapacitated and unable to perform his duties.  Please excuse him for the following days: 10-4-14 thru 12-12-14."].)

### B.    Plaintiff's Absences In 2015 And 2016

On February 14, 2015, Plaintiff's supervisor at USPS, Kathy Holsome-Benion, issued him a warning letter for "fail[ing] to maintain regular attendance" and accruing unscheduled absences.  (Doc. 77-2 at 16-17, capitalization omitted.)[2]  The letter listed 19 unscheduled absences between December 4, 2014 and January 31, 2015.  (*Id.* at 16.)  The

---

[2]    During oral argument, Plaintiff asserted that because Holsome-Benion lacks credibility, none of her statements should be credited for summary judgment purposes.  As an initial matter, this argument misapprehends how summary judgment works.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, . . . the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'  Hence the nonmoving party may not merely state that it will discredit the moving party's evidence at trial . . . .") (citations and emphasis omitted); *Miller-Cunningham v. MacAllister*, 2019 WL 1130091, *6 (D. Ariz. 2019) ("Contrary to Plaintiff's counsel's assertion that the Court is necessarily determining Defendant's credibility by considering Defendant's undisputed testimony, the Court is not making a credibility determination, but is basing its decision on the only admissible evidence before the Court at summary judgment.").  At any rate, none of the analysis in this order turns alone on the acceptance of Holsome-Benion's testimony.

letter also stated that "[w]hen given an opportunity to explain on February 06, 2015, while in the presence of your union representative you stated that you had a medical condition. Your explanation does not relieve you of your responsibility to be regular in attendance." (*Id.*)  The letter notified Plaintiff that:

> In failing to comply with [various sections of the ELM],[3] you are failing to meet essential job requirements.  Furthermore, your continuing absenteeism from duty interferes with the efficiency of the operation.  When you are absent, your duties must be assigned to others, causing the Postal Service additional expense as well as disruption to the operation.  Your continuing failure to notify me of your status interferes with my ability to properly plan to meet operational needs.

(*Id.* at 17.)

On March 12, 2015, Dr. James Hicks, Plaintiff's mental health care provider, sent USPS a letter regarding Plaintiff's treatment and status.  (Doc. 80-18 at 10.)  The letter stated, in relevant part:

> Please be advised that for medical (sinusitis and bronchitis) and psychiatric (depression) reasons, this patient has been on medical leave of absence [from] 2/17/15 – 3/12/15 and during that time he was unable to perform any of his job duties.  He may now return to work, starting 3/13/15, full-time, without accommodations.  I do not feel that he is any significant risk to himself or other people.  I do not feel that he would have any problems safely driving a Postal Service vehicle for up to six hours per day in performance of mail delivery duties and that in doing so he would not pose any significant risk to himself or other people.

(*Id.*)

On April 1, 2015, Plaintiff "[was] instructed to report for a fact finding on April 09, 2015 at 10:00 am at the station or telephonically regarding [his] attendance."  (Doc. 77-2

---

[3]      In relevant part, the ELM provides: "Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.  In addition, employees must provide acceptable evidence for absences when required. . . .  For absences in excess of 3 days, employees are required to submit medical documentation or other acceptable evidence of incapacity for work or of need to care for a family member and, if requested, substantiation of the family relationship. . . .  Employees are required to be regular in attendance.  Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service."  (Doc. 77-2 at 24-25.)

at 19.)

On April 3, 2015, Dr. Hicks sent USPS another letter regarding Plaintiff's treatment and status. (Doc. 80-18 at 9.) The letter was identical to Dr. Hicks's March 12, 2015 letter except that Dr. Hicks (1) extended Plaintiff's medical leave to April 6, 2015 and (2) provided that "[Plaintiff] may now return to work starting 4/06/15, full-time, without accommodations." (*Id.*) However, Plaintiff did not return to work on April 6, 2015. (Doc. 77-2 at 19 [listing April 3-8, 2015 as unscheduled absences].)

On April 9, 2015, Plaintiff "failed to report" to the fact-finding hearing in person or telephonically. (*Id.*) Instead, Plaintiff emailed USPS to state he would return to work on April 13, 2015. (Doc. 80-22 at 4 [fact-finding transcript describing email].) However, Plaintiff did not return to work on April 13, 2015. (*Id.* [Plaintiff: "I will state now that I have not been at work from February 17th through May 13th, today, due to my disability."].)

On May 8, 2015, Holsome-Benion issued Plaintiff a notice of discipline related to his absences. (Doc. 77-2 at 19-21.) The letter provided:

> This disciplinary seven (7) day no-time-off suspension is being issued to you for the following reasons: failure to follow instructions [and] continued failure to maintain regular attendance. From February 17, 2015 to April 8, 2015, you have incurred the following unscheduled absences from duty 296 hours including 8 hours AWOL: . . . You were previously apprised of your responsibility to maintain regular attendance on February 3, 2015. . . . Your failure to report for your fact finding on April 9, 2015, however, does not relieve you of your responsibility to follow the instructions of your supervisor and be regular in attendance. . . . While this suspension does not result in a loss of time or pay, it is equivalent to and is of the same degree of seriousness as a time-off suspension. It satisfies the same requirement for progressive discipline as a time-off suspension, and may be cited as an element of past discipline in subsequent discipline pursuant to Article 16.10.

(*Id.*, cleaned up.)

On May 13, 2015, Plaintiff participated in a fact-finding hearing with USPS regarding his unscheduled absences. (Doc. 80-22 [transcript].) At the hearing, Plaintiff requested one reasonable accommodation—to excuse his absences from February 17, 2015

through May 13, 2015.  (*Id.* at 4-5 ["Furthermore, I am requesting a reasonable accommodation for those dates and prior dates that I will make clear in my request."].)

That same day, Dr. Hicks sent USPS a letter.  (Doc. 80-18 at 8.)  The letter was nearly identical to Dr. Hicks's April 3, 2015 letter except that it (1) identified additional psychiatric disabilities—PTSD and stress anxiety disorder—and noted that those disabilities "cause episodic manifestations"; (2) extended the timeframe of Plaintiff's medical leave to May 13, 2015; and (3) provided that Plaintiff "may now return to working, starting 5/14/15, full-time without accommodations."  (*Id.*)

Between June 10, 2015 and September 30, 2015, Plaintiff again "fail[ed] to maintain regular attendance," incurring "176 hours of unscheduled absences" during this period. (Doc. 77-2 at 4-5 ¶ 12; *id.* at 33.)

On September 28, 2015, USPS held another fact-finding hearing regarding Plaintiff's absences.  (*Id.* at 33 ["When given an opportunity to explain on 09/28/2015 . . . ."].)  At the hearing, Plaintiff, "while accompanied by [his] union representative . . . stated that [he was] sick."  (*Id.*)  USPS notified Plaintiff that this "explanation, however, does not relieve [him] of [his] responsibility to maintain regular attendance."  (*Id.*)

On September 30, 2015, Antonio Cosio, Holsome-Benion's supervisor (*id.* at 82), issued Plaintiff a 14-day no-time-off suspension letter because of his "continued failure to maintain regular attendance."  (*Id.* at 33-34, capitalization omitted.)

During the periods of November 17-23, 2015 and December 29-30, 2015, Plaintiff did not show up for work.  (Doc. 80-19 at 3.)

On January 28, 2016, Holsome-Benion sent Plaintiff a duty status letter advising him that:

> You have been absent from duty without authorization from January 25, 2016 to present.  You have failed to notify me about the reason for and expected duration of your absence.  Additionally, you have failed to submit documentation to substantiate your absence.
>
> You are hereby instructed to report for duty on your next scheduled workday after receiving this letter.  If you are unable to report for duty for any reason, you are hereby instructed to immediately notify me at [number redacted],

about your current duty status and your expected date of return duty.  Do not email me.

If your absence is due to illness or injury and you do not return to work the next scheduled workday following your receipt of this letter, you must provide acceptable medical documentation immediately, but no later than 3 business days from your receipt of this letter.

If your absence is due to any reason not related to illness or injury, you must present proof of the reason for your absence and that it prevented you from reporting as scheduled.  You must provide acceptable documentation upon your return to duty or no later than 3 days from your receipt of this notice.

If you fail to return to work and/or you fail to submit acceptable documentation in a timely manner, as instructed in this notice, your absence may be charged to AWOL and you may be subject to disciplinary action, up to and including removal from the Postal Service.

(Doc. 77-2 at 36.)

On February 3, 2016, Holsome-Benion sent Plaintiff another letter, this one instructing him "to report for a fact-finding on February 06, 2016, at 10:00 am." (*Id.* at 38.)  The letter alternatively provided that "[i]f you are unable to attend due to incapacitation, you are instructed to call [number redacted] to attend telephonically.  Do not email me." (*Id.*)  The letter also advised that "failure to report for this fact-finding may result in disciplinary action, up to and including removal from the Postal Service." (*Id.*) That same day, Holsome-Benion emailed Halina Gronowski, the chief nurse administrator of the USPS medical unit, to inquire whether the medical unit had received any documentation from Plaintiff. (*Id.* at 40.)  Gronowski replied that the only documentation on file was an attendance note from an office visit on September 21, 2015. (*Id.*)

On February 5, 2016, Plaintiff requested the day off work. (Doc. 80-17 at 2.)

On February 6, 2016, Plaintiff did not appear for the fact-finding hearing in person or telephonically. (Doc. 77-2 at 46.)  Instead, Plaintiff requested the day off work. (Doc. 80-17 at 3.)

On February 25, 2016, Holsome-Benion emailed Gronowski again to ask if the medical unit had received additional medical documentation from Plaintiff. (Doc. 77-2 at

42.)   Gronowski replied that the medical unit received a note on February 11, 2016 "releasing [Plaintiff] to work on 2/18/2016 after surgery."  (*Id.*; *see also id.* at 44 [actual note].)  Gronowski also stated that "[Plaintiff] has no special employee privilege that I am aware of.  His supervisor should not have to be chasing down his documentation."  (*Id.* at 42.)  That same day, Holsome-Benion sent Plaintiff a fact-finding notice:

> You are hereby notified that a final fact-finding has been scheduled. Therefore you are instructed to report to this fact-finding on Wednesday, March 02, 2016 at 10:00 AM. . . .   The subject of this fact-finding is pertaining to your continued employment status with the U.S. Postal Service. If you are unable to attend due to incapacitation, you are instructed to call [number redacted] to attend telephonically.  Do not email me.
>
> Please be advised that your failure to report for this fact-finding will result in a decision being made regarding your employment status without the benefit of your input.   Your failure to attend [the] fact-finding may result in appropriate administrative action, up to and including removal from the Postal Service.

(*Id.* at 46.)

On February 29, 2016, Gronowski received a letter from Dr. M. Zuhdi Jasser excusing Plaintiff's absences from February 18, 2016 to February 29, 2016 while Plaintiff recovered from surgery.  (*Id.* at 48.)  The letter "cleared [Plaintiff] to return back to work with no restrictions" on February 29, 2016.  (*Id.*)  However, that same morning, Plaintiff requested leave for February 29, 2016.  (Doc. 80-17 at 4).

On March 1, 2016, Plaintiff requested the day off work.  (*Id.* at 5.)

On March 2, 2016, Plaintiff failed to appear at the fact-finding hearing in person or telephonically.  (Doc. 77-2 at 68.)  Instead, Plaintiff again requested the day off work. (Doc. 80-17 at 6.)  Additionally, and contrary to the instructions in the February 25, 2016 letter (*i.e.*, "Do not email me"), Plaintiff sent an email to Holsome-Benion and several other individuals.  (Doc. 80-6.)  The email stated:

> I am sending an email as it is the only way I can communicate at this time.  I am requesting the fact finding be rescheduled as I cannot participate as I am incapacitated.   To force me to participate in a fact finding when I am

incapacitated violates my civil rights as does holding a fact finding without me. This is also a formal request for a reasonable accommodation for my disability. As I have suffered an episodic event which coincided with my scheduled surgery and physical illness. My request is that the time off to be as an approved absence and that there be no disciplinary action towards me for time needed to recover from my disability.

(*Id.* at 2.) In response, one of the recipients—Cathy Hernandez, a member of USPS's District Reasonable Accommodation Committee ("DRAC")—reminded Plaintiff that he was "required to call in and speak with the supervisor not communicate via e-mail" and that she did not supervise the South Mountain USPS location where he was employed. (Doc. 77-2 at 52.) Hernandez also forwarded Plaintiff's email to Holsome-Benion and Cosio, who then forwarded it to Gronowski and Regina Beckhum, members of the DRAC. (*Id.* at 51.)

On March 4, 2016, the USPS medical unit received a letter from Dr. Hicks stating that Plaintiff experienced "episodes flare up of PTSD, Stress Anxiety Disorder" from January 3, 2016, through March 4, 2016. (*Id.* at 54.) The letter stated that Plaintiff "ha[d] been seen by [Dr. Hicks] on 2-5-16 and 3-3-16." (*Id.*) The letter also provided that Plaintiff "may return to full duty with no restrictions" on March 5, 2016. (*Id.*)[4] However, Plaintiff did not return to work on March 5, 2016. (Doc. 80-4 at 13.)

On March 9, 2016, Holsome-Benion followed up with Gronowski concerning Plaintiff's March 2, 2016 request for a reasonable accommodation and requested advice on "[w]hat is the process and how do I respond since we have received medical documentation from his medical provider releasing him back to full duty however, he continues to call in." (Doc. 77-2 at 51.) Gronowski replied:

There are many releases on file that return John Chandler to work without restrictions. If he is not returning as per physicians recommendations then the issue is an attendance administrative issue and may be managed administratively. . . . There is not a single FMLA case in [USPS's leave

---

[4] Dr. Hicks also noted in the letter that Plaintiff "has been cleared by his ENT [ear, nose, and throat doctor] and his PCP [primary care physician] to return to work as of 3-1-16 for his physical health conditions." (*Id.*)

- 9 -

management system] and he no longer qualifies for FMLA protected leave due to insufficient work hours (1000). His documentation indicates his absences are for various reasons and various health professionals all returning him to full duty. Things for the supervisor to consider when discussing reasonable accommodation:

[Plaintiff's] request for a reasonable accommodation needs to be supported by objective information on how the reasonable accommodation being requested would enable him to perform the essential functions of his position.

Has [Plaintiff] exercised his right to request FMLA leave or light duty or provided any evidence that he has permanent or long-term medical restrictions based on an impairment that meets the definition of a disability?

When [Plaintiff] is at work have you observed that he has workplace/or work performance issues that lead you to reasonably believe the performance is related to a medical condition?

There are no medical limitations on file for the DRAC to consider. If he is claiming that he has a disability and something has changed then he may be advised to produce documentation explaining the disability, the impairment and the permanent or long term limitations impacting his mental/physical functioning. [Plaintiff] had been referred for reasonable accommodation of medical limitations impacting his attendance a few years back. He persuaded the DRAC that he had no limitations and was able to perform all his duties so the DRAC closed his case.

(*Id.* at 50.)

That same day, Holsome-Benion sent Plaintiff a letter regarding his reasonable accommodation request. (Doc. 80-7.)[5] The letter explained:

This is in response to your request for Reasonable Accommodation via email on March 02, 2016. Documentation with a fax date of February 29, 2016, cleared you to return back to work with no restrictions. Further, documentation dated March 3, 2016 from a different medical provider also indicated that you may return to full duty with no restrictions on 3-5-16. There are no medical limitations on file for the DRAC to consider. If something has changed then you are advised to provide documentation explaining: 1. The disability. 2. The impairment. 3. The long term

---

[5]     Holsome-Benion stated that "[she] did not have a verbal discussion with [Plaintiff] regarding his email request for a reasonable accommodation on 3/2/16 because he was not coming to work and would not call to speak to [her] as instructed." (Doc. 77-2 at 87.)

limitations impacting your mental/physical function.

(*Id.* at 2.)  Plaintiff did not file a grievance challenging this letter (Doc. 80-12 at 19) or contact Holsome-Benion (Doc. 77-2 at 8 ¶ 30).  Plaintiff also "did not return to work" after receiving the letter.  (Doc. 80-18 at 5 [doctor's letter excusing Plaintiff's absences from work between March 5, 2016 and March 22, 2016].)

On March 22, 2016, Plaintiff sent the USPS medical unit a letter from Dr. Hicks excusing him from work between March 5, 2016, and March 22, 2016 because his "episodic flare up from PTSD, Stress Anxiety Disorder coincides with his health conditions from 3-5-16 thru 3-22-16."  (*Id.*)  The letter also cleared Plaintiff to "return to full duty with no restrictions" on March 23, 2016.  (*Id.*)[6]  However, Plaintiff did not return to work on March 23, 2016.  (Doc. 80-4 at 14-15.)

On March 25, 2016, Holsome-Benion sent Plaintiff a notice-of-removal letter.  (Doc. 77-2 at 67-69.)

On March 31, 2016, Plaintiff received the letter.  (*Id.* at 71.)  The letter stated, in relevant part:

> You are hereby notified that you will be removed from the Postal Service on May 7, 2016.  The reasons for this action are: charge: continued failure to maintain regular attendance.  Since November 17, 2015, you have failed to maintain regular attendance, incurring the following instances of unscheduled absenteeism on the following occasions. . . .[7]  In addition to the above, the following elements of your past record have been considered in taking this action: 02/14/15 Letter of Warning—Failure to Maintain Regular Attendance.     05/08/15   7-Day   Suspension—Failure   to   Follow Instructions/Continued Failure to Maintain Regular Attendance.  09/30/15

---

[6]     Dr. Hicks also noted that "[Plaintiff] has been seen by Medical Providers on 3-6-16 and 3-18-16 for his physical health conditions and has been cleared to return to work on 3-19-16."  (*Id.*)

[7]     The dates listed are November 17-21 and 23, 2015; December 29-30, 2015; January 25-28, 2016; February 1-6, 18-20, 22-23, 25-27 and 29, 2016; and March 1-2, 2016.  (*Id.* at 67-68.)  Plaintiff submitted leave requests for many of these absences on the day of each absence, making them "unscheduled absences" under USPS policy.  (Doc. 80-15 at 2-8, 10-13; Doc. 80-17 at 2-6.)  Additionally, Plaintiff did not submit his leave requests for February 18-20, 22-23, and 25-27, 2016 until April 4, 2016.  (Doc. 80-15 at 9.)  USPS marked Plaintiff's absences on December 29-30, 2015 as unscheduled sick leave.  (Doc. 77-2 at 128.)

> 14-Day Suspension—Continued Failure to Maintain Regular Attendance . . . .  You have the right to file a grievance under the Grievance-Arbitration procedure set forth in Article 15, Section 2, of the National Agreement within 14 days of your receipt of this notice. . . .  This removal will be deferred until a decision is made on the grievance . . . .

(*Id.* at 67-69, cleaned up.)  Plaintiff, in turn, filed a grievance regarding his removal.  (Doc. 80-23 at 30.)

On April 1, 2016, Plaintiff returned to work for "the first time . . . since January 23, 2016."  (Doc. 77-2 at 10 ¶ 38.)

On April 4, 2016, Plaintiff signed a USPS form entitled "Request for or Notification of Absence" in which he requested an accommodation under the Americans with Disabilities Act ("ADA") for his unscheduled absences from January 25, 2016 to March 31, 2016.  (Doc. 80-15 at 9.)  USPS, in turn, excused Plaintiff's leave from February 9, 2016 to February 13, 2016 as sick leave "because he had submitted a request in advance on December 15, 2015, and this absence was not cited in the notice of removal."  (Doc. 77-2 at 10 ¶ 40; Doc. 80-15 at 14 [request for or notification of absence].)  USPS also excused Plaintiff's absences on March 9, 2016, March 10, 2016, March 30, 2016, and March 31, 2016.  (Doc. 80-15 at 15-18 [request for or notification of absence]; Doc. 77-2 at 75-78 [excusing Plaintiff's absences].)

On April 27, 2016, Dr. Hicks faxed a letter to USPS regarding Plaintiff.  (Doc. 80-5.)  In relevant part, the letter stated:

> In a letter dated December 30, 2014 to Halina Gronowski, RN, CCM I stated the need for time off work as an accommodation.  Again I am recommending that [Plaintiff] be given an accommodation for the time off he needs to recover from his episodic flare up of PTSD, Stress, and Anxiety Disorder . . . .  His flare up from January 25, 2016 through March 31, 2016 coincided with several physical health conditions.  [Plaintiff] is improving and his future absenteeism should decline with time.  He desires to be at work and is working through his personal issues to avoid such flare ups in the future.

(*Id.* at 2.)

On May 7, 2016, USPS terminated Plaintiff's employment.  (Doc. 77-2 at 67.)

II.    Procedural History

On May 13, 2020, Plaintiff initiated this action.  (Doc. 1.)  In his initial complaint, Plaintiff asserted claims for (1) disability discrimination in violation of the ADA, the Americans with Disabilities Act Amendments Act ("ADAAA"), and the Rehabilitation Act; (2) race and sex discrimination in violation of Title VII of the Civil Rights Act; and (3) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA").  (*Id.* ¶¶ 1, 6, 41-57.)  Plaintiff further alleged that he suffered discriminated when USPS's Equal Employment Office ("EEO") did not follow proper disability accommodation procedures and that USPS had "a continuing pattern and practice" of treating him differently and of not recognizing his disability.  (*Id.* ¶¶ 7, 14, 21, 39, 42.)

In February 2021, the Court dismissed most of Plaintiff's claims and granted leave to amend as to some (but not all) of the dismissed claims.  (Doc. 18.)  First, the Court dismissed the ADA and ADAAA components of Count One without leave to amend because both parties agreed that Plaintiff, as a federal employee, could not bring claims under the ADA or ADAAA and that his disability-related claims could only be brought under the Rehabilitation Act.  (*Id.* at 10.)  Second, the Court concluded that, because the applicable regulations required Plaintiff to exhaust administrative remedies by initiating contact with an agency EEO counselor within 45 days of each discriminatory act, and Plaintiff did not "first initiate[] contact with an Agency EEO counselor [until] April 4, 2016," any claim based on conduct occurring before February 19, 2016 was time-barred. (*Id.* at 10-13.)  This meant that "the majority of Plaintiff's claims of discrimination under the Rehabilitation Act, Title VII, and the ADEA must be dismissed." (*Id.* at 10.)  Only six alleged discriminatory acts, described below, survived dismissal on this ground.  (*Id.* at 13.)  As to the claims dismissed on timeliness grounds, the dismissal was with leave to amend, "but only to the extent Plaintiff can plead additional facts showing that he sought counseling within 45 days of the challenged conduct and/or that might support a claim of waiver, equitable estoppel, or equitable tolling." (*Id.* at 18.)  Third, to the extent the complaint could be construed as raising standalone claims based on the misprocessing of

Plaintiff's administrative complaints, the Court dismissed those claims without leave to amend. (*Id.* at 19-20.) Fourth, the Court concluded that Plaintiff's ADEA and Title VII claims should be dismissed. (*Id.* at 21-26.)

On March 31, 2021, Plaintiff filed the First Amended Complaint ("FAC"). (Doc. 21.) In the FAC, Plaintiff asserted claims for (1) age discrimination in violation of the ADEA (*id.* at ¶¶ 66-74); (2) "retaliation for [Plaintiff's] repeated requests for accommodation" (*id.* at ¶¶ 49, 75-80); and (3) a hostile work environment (*id.* at ¶¶ 52-53). Plaintiff further alleged that he was discriminated against when USPS's EEO did not follow proper disability accommodation procedures, including "never entering into the interactive process for reasonable accommodation," and that USPS had "a continuing pattern and practice" of treating him differently and of not recognizing his disability. (*Id.* ¶¶ 7, 14, 19, 25, 27, 30, 36, 42, 43, 56.) The FAC also alleged a new disability (plantar fasciitis) that was not mentioned in the original complaint. (*Id.* ¶¶ 6, 8.) The FAC also added new allegations in support of Plaintiff's pattern-and-practice claim. (*Id.* ¶¶ 17, 18, 32, 52, 74.)

On October 1, 2021, the Court dismissed all but one of Plaintiff's claims. (Doc. 35.) First, the Court disregarded the new facts and claims in the FAC "that exceeded the limited scope of leave to amend granted in the February 2021 order." (*Id.* at 4-5.) That order "authorized Plaintiff to amend his complaint in only three respects: (1) pleading new facts to show that Plaintiff sought counseling within 45 days of each instance of challenged conduct; (2) pleading new facts that might support a claim of waiver, equitable estoppel, or equitable tolling; and (3) pleading new facts that might cure the additional deficiencies associated with Plaintiff's ADEA and Title VII claims (*i.e.*, alleging satisfactory performance and identifying relevant comparators)." (*Id.* at 4.) Thus, Plaintiff's new assertion of a plantar fasciitis disability, new pattern-and-practice allegations, and new claims of a hostile work environment and retaliation were disregarded. (*Id.* at 6.) Second, the Court concluded that Plaintiff's claims for alleged discriminatory conduct occurring before February 19, 2016 remained untimely because Plaintiff's EEO-related additions in the FAC "do not, without more, plausibly establish administrative exhaustion." (*Id.* at 9.)

1   Third, the Court dismissed the ADEA claim without leave to amend because Plaintiff

2   "provided only vague and conclusory allegations as to whether younger employees had

3   received favorable treatment"—for example, Plaintiff failed to allege the ages of the

4   employees and what favorable treatment they received. (*Id.* at 9-11.)

5        In light of the October 1, 2021 order, the sole remaining claim in the FAC is

6   Plaintiff's Rehabilitation Act claim premised on six alleged acts: "(1) the March 2, 2016

7   mishandling of Plaintiff's accommodation request, including by ignoring a letter from

8   Plaintiff's doctor stating that Plaintiff needed time away from work to address his

9   psychological issues; (2) the March 9, 2016 response from Holsome-Benion to Plaintiff's

10  request for accommodation; (3) the March 21, 2016 findings of fact issued against Plaintiff

11  while he was incapacitated due to his disability and unable to attend the proceeding, and

12  the denial of his request for postponement of the fact-finding proceeding;[8] (4) the March

13  31, 2016 denial of Plaintiff's request for accommodation; (5) the April 4, 2016 denial of

14  Plaintiff's request for accommodation; and (6) the April 27, 2016, failure to follow policies

15  or procedures." (Doc. 18 at 13, citations omitted.)

16       On April 17, 2023, Defendant filed the pending motion for summary judgment.

17  (Doc. 77.)  The motion later became fully briefed.  (Docs. 80, 83.)

18       On January 10, 2024, the Court issued a tentative ruling.  (Doc. 87.)

19       On January 24, 2024, the Court heard oral argument.  (Doc. 88.)

20                              **DISCUSSION**

21  I.    <u>Legal Standard</u>

22       "The court shall grant summary judgment if [a] movant shows that there is no

23  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

24  of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

25  the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

26  in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

27

28  _____

[8]      Defendant argues there was no fact-finding hearing on March 21, 2016.  (Doc. 77
at 2.)

1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.     The Rehabilitation Act

"To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007), *superseded by statute on other grounds as recognized in Nunies v. HIE Holdings, Inc.*, 908 F.3d 428 (9th Cir. 2018).  Because Defendant does not dispute that Plaintiff is disabled (Doc. 77 at 10), the analysis here focuses on the second and third elements.  As for the third element, Plaintiff seems to assert two overlapping theories of discrimination: (1) failure to accommodate; and (2) failure to engage in an interactive process regarding his request for reasonable accommodation. (Doc. 21 at 14; Doc. 80 at 14-15.)

     A.     **Qualified Individual**

          1.     The Parties' Arguments

Defendant notes that, under the Rehabilitation Act, a "qualified individual" is a person with a disability who can perform the essential functions of the job "with or without reasonable accommodation."  (Doc. 77 at 10.)  Defendant argues that Plaintiff does not meet this definition for the simple reason that physical attendance is an essential function of the letter carrier position—"It is common-sense that delivering the mail must be done in-person and cannot be done at all if the employee is unable to physically attend work"— yet Plaintiff "expressly stated that his disability symptoms included an inability to go to work or interact with people" and "testified he was unable to go to work on 'most days, every day.'"  (*Id.* at 10-12.)  In a related vein, Defendant argues that no reasonable accommodation would allow Plaintiff to perform the essential functions of the job because "[o]ther than not taking disciplinary action toward him for violating USPS's attendance policy, Mr. Chandler could not identify a single reasonable accommodation that USPS [could offer] that would have allowed him to be physically at work to deliver the mail." (*Id.* at 12.)  Defendant contends that Plaintiff's "mere speculation that he would have come back to work sooner if he was not disciplined for violating USPS's attendance policy [fails

to] establish that a reasonable accommodation existed that would have allowed him to perform the essential functions of attending his job to deliver the mail," "particularly . . . where he testified he was unable to leave his home or function in day-to-day activities." (*Id.*)  Defendant also argues that some of Plaintiff's purported reasonable accommodations are improper retrospective requests—reasonable accommodations "are not exemptions from the essential functions nor are they carte blanche excuses to not appear at work, let alone for weeks on end, in direct violation of an employer's attendance policy." (*Id.* at 16.) Finally, Defendant argues that "any proposed accommodation that would permit Mr. Chandler to continue taking unscheduled leave without notice for weeks or months at a time, simply excusing his indefinite absences upon return, would have caused USPS undue hardship and is unreasonable as a matter of law." (*Id.* at 13.  *See also id.* at 16-17 ["[G]rant[ing] Mr. Chandler a blanket excuse for failing to appear for his job for over two months, which he had done on several occasions. . . . would have caused undue hardship— particularly, where Mr. Chandler had a pattern of being absent from work for weeks, up to months, on end, USPS had no advance notice of the leave, Mr. Chandler failed to communicate with USPS about his status or expected date of return, and the amount of . . . leave requested was undetermined."].)

In response, Plaintiff argues, albeit with less than ideal clarity and organization, that he "is a qualified individual." (Doc. 80 at 9, capitalization omitted.)  As an initial matter, Plaintiff disputes Defendant's contention that attendance is an essential function of the job, arguing that there are two official job descriptions for his position and one of them "does not refer to attendance." (*Id.* at 11.)  More broadly, Plaintiff argues that "[t]he fact that there are two position descriptions precludes summary judgment as it creates a genuine factual dispute." (*Id.* at 8, 11.)  Alternatively, Plaintiff argues that "with the approval of an accommodation [he] can perform the essential function of his job." (*Id.* at 10.)  Relatedly, Plaintiff argues that an accommodation "for intermittent leave and or for scheduled time off to heal" "was not an undue hardship" because "[a]n accommodation [of] intermittent approved leave under FMLA had previously worked" and "[t]here was no evidence that it

was of an undue hardship on USPS." (*Id.* at 15-16, capitalization omitted.)  Plaintiff also argues that his requests for reasonable accommodation were not retroactive because he "made the requests timely for his requested accommodation CONTINUALLY and has not asked for any retroactive treatment.  He more or less continually asked through 2013, 2014, and 2015." (*Id.* at 16.)  Last, Plaintiff argues that Defendant's reliance on *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233 (9th Cir. 2012), is "seriously misguided" because unlike "[t]he *Samper* case [which] involved an unspecified number of unplanned absences," his "disability and requested accommodation was not open ended and he had a doctor that responded to a medical inquiry by stating that the only issue having to do with any type of accommodation would be the time [he] needed off work in order to get well from his issues." (*Id.* at 9-10.)

In reply, Defendant essentially reiterates the arguments from the motion for summary judgment, specifically that (1) "[b]ecause Plaintiff's disability kept him from attending work to deliver the mail for months at a time, he cannot perform his essential job function: to deliver the mail"; and (2) the requested accommodations of "'intermittent leave,' 'part-time' work or, more generally, 'time off to heal'" are "exemptions from Plaintiff's essential job function." (Doc. 83 at 3.)  Additionally, Defendant argues that "Plaintiff's past use of leave *did not* result in his ability to perform his essential job functions" because "Plaintiff continued to not appear at work to deliver the mail and his chronic absenteeism continued." (*Id.*, emphasis in original.)  Defendant also argues that "Plaintiff . . . fails to explain how 'part-time' work would allow him to maintain regular and reliable attendance where his disability was episodic in nature." (*Id.* at 5.)  Defendant further argues that "[b]y failing to adhere to USPS's rules and regulations through his chronic absenteeism, USPS was required to reassign his duties to other employees to complete, causing the USPS additional expense as well as disruption to postal operations.  For these reasons, allowing Plaintiff to continue to take leave on an as needed or intermittent basis would continue to disrupt postal operations and cause USPS undue hardship." (*Id.* at 6, internal citation omitted.)

2.     Analysis

Plaintiff "bears the burden to prove that he is 'qualified.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (citation omitted).  In this context, a "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  *See also Coons v. Sec'y of the U.S. Dep't of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) ("The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act . . . .").  "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply."  *Bates*, 511 F.3d at 989 (citation omitted).

"Qualification for a position is a two-step inquiry.  The court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position.  The court then considers whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation."  *Id.* at 990.  Here, the parties only dispute the second step, which involves two inquiries: (1) identifying the essential functions of Plaintiff's job; and (2) evaluating whether Plaintiff has demonstrated that he can perform those essential functions with or without a reasonable accommodation.  *Thomas v. DeJoy*, 2022 WL 19829436, *6 (C.D. Cal. 2022).  "In many cases, the question whether someone can perform the essential functions of a job is intertwined with the question whether an accommodation that would permit an employee to perform the job is a 'reasonable accommodation' that does not impose an 'undue hardship.'  These questions are often inextricably linked because . . . when an employee needs an accommodation to perform a job's essential functions, the employee is a qualified individual (i.e. an individual with a disability who can perform the job's essential functions) only if the accommodation is reasonable and making the accommodation would not impose an 'undue hardship' on the employer."  *Cripe v. City of San Jose*, 261 F.3d 877, 885 n.7 (9th Cir. 2001) (citation omitted).

1

a.    **Essential Functions**

2    "Under the Rehabilitation Act, . . . [e]ssential functions are the fundamental duties

3    of the relevant position." *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir.

4    1998).   "[A]n employer who disputes the plaintiff's claim that he can perform the essential

5    functions must put forth evidence establishing those functions." *Bates*, 511 F.3d at 991

6    (citation omitted).   "[W]hen determining whether a job requirement is an 'essential

7    function,' 'consideration shall be given to the employer's judgment as to what functions of

8    a job are essential, and if an employer has prepared a written description before advertising

9    or interviewing applicants for the job, this description shall be considered evidence of the

10    essential functions of the job.'"   *Cripe*, 261 F.3d at 887 (quoting 42 U.S.C. § 12111(8)).

11    "Where there is conflict in the evidence regarding the essential functions of a position, we

12    conclude that there is a factual dispute, notwithstanding the job descriptions that an

13    employer has prepared."   *Rohr v. Salt River Project Agric. Improvement & Power Dist.*,

14    555 F.3d 850, 864 (9th Cir. 2009) (cleaned up).

15    Here, Defendant has easily satisfied its burden of showing that physical attendance

16    is an essential function of the City Letter Carrier position.   Although Defendant apparently

17    utilized two different position descriptions for that position, both demonstrate that the job

18    requires physical presence at work to deliver mail.   One position description identifies the

19    job's "function" as "[d]elivers and collects mail on foot or by vehicle under varying

20    conditions in a prescribed area." (Doc. 77-2 at 13.)   Such activities obviously require

21    physical attendance. *Cf. Hill v. City of Phoenix*, 162 F. Supp. 3d 918, 925 (D. Ariz. 2016),

22    *order clarified*, 2016 WL 3457895 (D. Ariz. 2016) ("The City points to a written job

23    description that contemplates that police sergeants will be physically present in the

24    workplace.").   This description also provides that "City Carriers must follow Postal Service

25    policies and procedures for personal conduct at work, including adhering to rules and

26    regulations." (Doc. 77-2 at 13.)   The cross-referenced rules and regulations include the

27    ELM, which in relevant part provides that "[e]mployees are required to be regular in

28    attendance." (*Id.* at 25.)   *See also Samper*, 675 F.3d at 1238 ("Providence notes that the

written job description required strict adherence to the attendance policy.").

Meanwhile, the other position description provides that "[a]ll Carriers perform office duties and street delivery. . . .  Carriers sort mail into shelving with vertical slots or separations.  The shelving surrounds the Carrier on three sides. . . .  Street delivery duties may vary from 4 to 6 hours (2 to 3 hours for walk-out routes) . . . ."  (Doc. 80-18 at 14.)  The description also identifies the "functional purpose" of the position as "[d]eliver[ing] and collect[ing] mail on foot or by vehicle under varying road and weather conditions in a prescribed area."  (*Id.* at 15, capitalization omitted.)  Again, such activities obviously require physical attendance.

Given this backdrop, there is no merit to Plaintiff's argument that "[t]he . . . two position descriptions precludes summary judgment as it creates a genuine factual dispute."  (Doc. 80 at 11.)  Although the second position description does not explicitly identify the position's "essential duties," it still identifies attendance to deliver mail as an essential function of the position.  (Doc. 80-18 at 14-15.)[9]  It follows that any minor differences between the two position descriptions are not material within the meaning of Rule 56.  The bottom line is that the responsibilities of a City Letter Carrier, under either position description, include physical presence at work.  Many other courts, including the Ninth Circuit, have reached the same conclusion in relation to the position of letter carrier.  *See, e.g.*, *Brewer v. United States Postal Serv.*, 2023 WL 4637112, *1 (9th Cir. 2023) ("Regular attendance is an essential function of Brewer's letter-carrier position which he could not fulfill even with his requested accommodation."); *Cummings v. DeJoy*, 2023 WL 7282293,

---

[9]     During oral argument, Plaintiff asserted that only 25% of the City Letter Carrier responsibilities pertain to delivering mail.  Putting aside the fact that the genesis of this 25% figure is unclear—one of the position descriptions sets forth a series of percentages without apparently connecting those percentages to any specific tasks (Doc. 80-18 at 14), while an EEO investigative affidavit contains a more specific discussion of the 25% figure (Doc. Doc. 77-2 at 85)—Plaintiff overlooks that all of the other stated responsibilities in these documents also require physical presence at work.  (Doc. 80-18 at 14 ["All carriers perform office duties and street delivery."]; Doc. 77-2 at 85 ["The Complainant is required to route and case all classes of mail daily 25% of annual time, withdraw mail and prepare it for efficient delivery by himself 10%, handles undeliverable mail daily 5% of annual time, deliver mail along a prescribed route 75% of annual time, and use scanner and reports all unusual incidents or conditions 10% of annual time."].)

*4 (D. Ariz. 2023) ("The Court adopts as essential functions those that are required to accomplish the primary objective of delivering the mail and listed in the job description for letter carriers . . . ."); *Brown v. Brennan*, 2019 WL 13251354, *8 (N.D. Cal. 2019), *aff'd sub nom. Brown v. DeJoy*, 2021 WL 5412459 (9th Cir. 2021) ("[C]ourts have found that the delivery of mail is not just essential but the ultimate function of a letter carrier.") (cleaned up); *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996) ("One of the essential functions of a mail carrier is to physically deliver the mail to the people along the route."). Indeed, "[i]t is a 'rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual.'" *Samper*, 675 F.3d at 1237 (citation omitted).[10]

Defendant's earlier provision of FMLA and medical leave to Plaintiff does not undermine the conclusion that physical attendance is an essential function of the City Letter Carrier position. The Ninth Circuit has categorized attendance as an essential function even when an employer previously granted an employee time off. *Id.* at 1239 ("Samper offers nothing to rebut Providence's undisputed evidence except for highlighting that Providence's policy allows for some unplanned absences, and that her absences had exceeded those permitted under the policy in past years without repercussions."). *See also Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 670-71 (8th Cir. 2019) ("The fact that Union Pacific previously accommodated Higgins's back pain by allowing him to miss a large percentage of his shifts also does not create a material question of fact regarding whether job attendance is an essential function. . . . Indeed, an employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.") (cleaned up);

---

[10]   The conclusion that attendance to deliver mail is an essential function of the City Letter Carrier position is also supported by Plaintiff's own statements. During his deposition in this case, Plaintiff described his job responsibilities as "[s]ort and deliver mail, interact with customers, supervisors, people, et cetera—drive." (Doc. 80-4 at 8.) Such activities require attendance at work. Plaintiff also received numerous warnings that his attendance at work was required. (*See, e.g.*, Doc. 77-2 at 16-17 ["Failure to maintain regular attendance is in violation . . . of the [ELM]. . . . In failing to comply with these regulations, you are failing to meet essential job requirements."]; *id.* at 20-21 [same]; *id.* at 33-34 [same]; *id.* at 68-69 [same].)

*Tomshack v. Wilkie*, 584 F. Supp. 3d 740, 753 (D.S.D. 2022) ("Reliable and consistent attendance during the workday was not nonessential to Tomshack's position merely because the Defendants allowed Tomshack to adopt a flexible, part-time schedule for two-plus years."); *Blake v. UPMC Passavant Hosp.*, 2008 WL 936917, *7 (W.D. Pa. 2008) ("UPMC's prior allowance of intermittent leave and excusal of some absences while assessing Blake's request for accommodation, does not translate to a concession that regular attendance is not an essential function of a phlebotomist position."). Attendance may no longer be considered an essential function of a job when an employer modifies a position to reduce the necessity of attendance for job performance, but that is not the case here. *Compare Lazcano v. Potter*, 468 F. Supp. 2d 1161, 1167-68 (N.D. Cal. 2007) ("Lazcano was employed by the USPS as a 'modified city carrier' for many years and allowed to perform functions other than delivering and casing mail. This constitutes some evidence that delivering and casing mail were not essential job functions for carriers. Lazcano has at least raised a genuine issue of material fact whether she was otherwise qualified under the Rehabilitation Act."). USPS never modified Plaintiff's job responsibilities or assigned him to a different position—until his termination, he remained a City Letter Carrier with the full responsibilities of that job.

### b. **Reasonable Accommodation**

Because Defendant has established that an essential function of Plaintiff's position was "attendance to physically deliver the mail," the burden shifts to Plaintiff to show he was able to maintain his attendance, with or without a reasonable accommodation.

It is undisputed that Plaintiff could not perform the essential functions of the City Letter Carrier position without a reasonable accommodation—Plaintiff's disability prevented him from attending work, and he could not deliver the mail unless he went to work. Accordingly, Plaintiff bears "the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of an available job." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006). Generally, "[d]etermining whether a proposed accommodation . . . is reasonable, including whether it

imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999). Thus, "[t]o avoid summary judgment," Plaintiff "need only show that an accommodation *seems reasonable on its face*, i.e., ordinarily or in the run of cases." *Dark*, 451 F.3d at 1088 (citation and internal quotation marks omitted). *See also Snapp v. United Transp. Union*, 889 F.3d 1088, 1101 (9th Cir. 2018) ("This burden of merely identifying a possible accommodation is a simple burden of production.").

"Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). *See also Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1047 (9th Cir. 1999) ("[O]nce the plaintiff has established the existence of a reasonable accommodation that would enable him or her to perform the essential functions of an available job, the burden switches to the defendant to show that this accommodation would constitute an undue hardship.") (citation omitted); *Cripe*, 261 F.3d at 885 ("[T]he question of 'undue hardship' arises only when an accommodation is necessary to enable a disabled person to perform a job's essential functions and the proposed accommodation is 'reasonable.'"). "The term 'undue hardship' means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)," which include the accommodation requested and the size and resources of the employer. 42 U.S.C. § 12111(10). *See Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987), *superseded by statute on other grounds as recognized in Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ("Accommodation is not reasonable if it either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program.") (cleaned up).[11]

---

[11]     During oral argument, Plaintiff asserted that the Supreme Court altered the standard for undue hardship in *Groff v. DeJoy*, 600 U.S. 447 (2023), to require a showing of "more than a *de minimis* cost." This argument does not change the analysis here. As an initial matter, *Groff*'s holding is limited to the context of "undue hardship *under Title VII*." *Id.* at 468 (emphasis added). *See also id.* at 454 ("With the benefit of thorough briefing and oral argument, we today clarify what Title VII requires."); *id.* at 473 ("Having clarified the Title VII undue-hardship standard . . . ."). *See also Thompson v. Asante Health Sys.*, 2023 WL 7348812, *7 (D. Or. 2023), *report and recommendation adopted*, 2023 WL 7326496 (D.

Additionally, the employer bears "an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation that would permit [the employee] to retain his employment." *Dark*, 451 F.3d at 1088.  If the employer "did not engage in any such process, summary judgment is available only if a reasonable finder of fact must conclude that 'there would in any event have been no reasonable accommodation available.'" *Id.* (citation omitted).

Reasonable accommodations can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).  However, "[t]he ADA does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark*, 451 F.3d at 1089.

Unfortunately, Plaintiff's briefing is not a model of clarity as to the specific accommodation he believes should have been provided to him.  In a March 2, 2016 email, Plaintiff made "a formal request for a reasonable accommodation for my disability" and then seemed to suggest that the requested accommodation was a retroactive determination that past unscheduled absences were excused: "My request is that the time off to be as an approved absence and that there be no disciplinary action towards me for time needed to recover from my disability."  (Doc. 80-6 at 2.)  Meanwhile, in an April 27, 2016 letter to USPS, one of Plaintiff's doctors (Dr. Hicks) asserted that Plaintiff should be granted, as an accommodation, a prospective leave term of indefinite duration: "I am recommending that Mr. Chandler be given an accommodation for the time off he needs to recover from his episodic flare up of PTSD, Stress, and Anxiety Disorder. . . .  Mr. Chandler is improving

---

Or. 2023) ("But the Court specifically said that conflating [the Title VII undue burden] standard with the medical standard and ADA caselaw would 'go too far.'") (citation omitted); *Jennings v. St. Luke's Health Network, Inc.*, 2023 WL 5938755, *5 n.4 (E.D. Pa. 2023 (describing *Groff* as "clarifying the undue hardship test under Title VII and declining to simply adopt ADA case law for the Title VII analysis").  More important, the undue-burden standard under the ADA and Rehabilitation Act has always required more than a *de minimis* burden—as noted, "undue burden" is statutorily defined in this context as "an action requiring *significant* difficulty or expense." 42 U.S.C. § 12111(10)(A) (emphasis added).  Thus, pre-*Groff*, "employers were required to make greater efforts to accommodate employees under the ADA than under Title VII." *Speer v. UCOR LLC*, 2023 WL 7305037, *2 n.4 (E.D. Tenn. 2023).

and his absenteeism should decline with time." (Doc. 80-5 at 2.) Similarly, during his deposition in this case, Plaintiff stated that "[a]t the particular moment" of March 2, 2016, he "needed leave as an accommodation." (Doc. 80-4 at 13.) However, Plaintiff also testified that the accommodation could have involved "[e]ven a reduced work schedule, or a part-time schedule temporarily or—any number of things." (*Id.*) Next, in his response to the summary judgment motion, Plaintiff argues that "[t]he interactive process accommodations could include intermittent leave, part time work and leave restructuring." (Doc. 80 at 8.) In a declaration attached to his response, Plaintiff similarly asserts that "[a]n accommodation scheme like FMLA would have reasonably accommodated me." (Doc. 80-2 ¶ 4.) Finally, during his deposition in this case, Plaintiff stated that "if I had support of work . . . maybe I would have called in and talked to Galen the supervisor . . . , and maybe we would have had a hypothetical conversation where he would have helped me out and I would have went to work." (Doc. 80-4 at 9.)

The reasonableness of each of these proffered accommodations is addressed below.

### i.   Excuse Past Unscheduled Absences

Plaintiff's first proffered accommodation—excusing his past unscheduled absences and/or treating them as approved absences—is a non-starter because it is retrospective. "Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability." U.S. EQUAL EMP. OPPORTUNITY COMM'N, No. 915.002, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT 36 (2002). *See also Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 922 (9th Cir. 2017) (citing this EEOC guidance document with approval when analyzing an employment discrimination claim under California's Fair Employment Housing Act); *Trahan v. Wayfair Maine*, LLC, 957 F.3d 54, 65 (1st Cir. 2020) ("Even though reasonableness necessarily depends on the circumstances of a given case, some general principles apply. For instance, a requested accommodation that simply excuses past misconduct is unreasonable as a matter of law. After all, the ADA does not oblige an employer to

accommodate an employee's disability retroactively.") (cleaned up); *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017) (collecting cases from the Second, Fifth, Seventh, and Eighth Circuits holding that requests to excuse past misconduct are not reasonable accommodations).

Plaintiff's argument to the contrary—that he "has not asked for any retroactive treatment" because "[h]e more or less continually asked [for a reasonable accommodation] through 2013, 2014, and 2015" (Doc. 80 at 16)—is unavailing. Even accepting that Plaintiff made various requests in 2013, 2014, and 2015 to excuse past absences and USPS granted those requests, there is no evidence that Plaintiff requested leave to cover all of his absences in late 2015 and 2016 before taking those absences.

### ii.   Leave

Plaintiff's next proffered accommodation is a leave of absence. As noted, Plaintiff's briefing and evidence can be construed as suggesting that this leave should have taken the form of an indefinite term of medical leave in 2016 until his health issues were resolved, or some unspecified form of intermittent leave, or a leave policy that mirrors the FMLA.

Plaintiff is correct that a leave of absence *can* serve as a reasonable accommodation under the ADA and Rehabilitation Act. "[W]here a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001). "[T]he ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation, and an employee only needs to satisfy the minimal requirement that a leave of absence could plausibly have enabled him adequately to perform his job." *Kachur v. NAV-LVH, LLC*, 817 F. App'x 359, 361 (9th Cir. 2020) (cleaned up). *See also Hummel v. Maricopa Cty. Adult Probation Dep't*, 800 F. App'x 556, 557 (9th Cir. 2020) ("Contrary to the district court's conclusion, Hummel is not precluded from being a 'qualified individual' simply because she was unable to perform essential functions of her position at the time of her termination. In fact, a reasonable

accommodation may take the form of an extended leave of absence that will, in the future, enable an individual to perform her essential job duties.") (citations omitted). Nevertheless, an initial—and dispositive—problem with Plaintiff's proffered accommodation is that neither he nor Dr. Hicks specified the duration of the leave of absence that would be necessary to enable him to begin performing the essential duties of his job (*i.e.*, maintaining regular attendance). Indeed, Plaintiff's deposition testimony and Dr. Hicks's April 27, 2016 letter both suggest that Plaintiff was seeking an indefinite term of leave until his health issues were resolved.[12] Likewise, Plaintiff's fleeting references to an accommodation of "intermittent leave" suggest that such leave would be available to him in perpetuity. But as the Ninth Circuit and other courts have recognized, although "[j]ob-protected leave for a fixed period can be an accommodation, . . . indefinite leave is not reasonable as a matter of law." *Makor v. Burlington N. Santa Fe Ry. Co.*, 680 F. App'x 542, 544 (9th Cir. 2017) (analyzing claim under California's Fair Employment and Housing Act). *See also Dark*, 451 F.3d at 1090 ("[R]ecovery time of unspecified duration may not be a reasonable accommodation . . . ."); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("Wood was requesting an accommodation of indefinite leaves of absence so that he could work at some uncertain point in the future. Wood's requested accommodation was not reasonable.");[13] *Myers v. Hose*, 50 F.3d 278, 280 (4th Cir. 1995) ("This appeal

---

[12]     In his response to the summary judgment motion, Plaintiff argues that his "requested accommodation was not open ended" because it would only encompass "the time [he] needed off work in order to get well from his issues." (Doc. 80 at 10. *See also id.* at 15-16 ["He never requested unlimited time off; he requested and provided medical support for his need to have intermittent leave and time off to heal."].) But Plaintiff's request is a quintessential example of an indefinite, open-ended request—it has no fixed ending date. Nor was Plaintiff's underlying condition of the sort that might be expected to have a finite (even if difficult to predict with precision) healing date. *Compare Ruiz v. ParadigmWorks Grp., Inc.*, 787 F. App'x 384, 386 (9th Cir. 2019) ("Ruiz's doctor provided a finite estimate of five weeks, and the mere fact that a medical leave has been repeatedly extended does not necessarily establish that it would continue indefinitely. Further, even if Ruiz ultimately needed to extend her medical leave longer, a broken ankle is the type of injury from which people generally heal in the foreseeable future.") (cleaned up). Meanwhile, to the extent Plaintiff suggested during oral argument that his requested accommodation was not open-ended because it would be limited (like the FMLA) to no more than 12 weeks of intermittent leave per year, that argument fails for reasons discussed elsewhere in this order.

[13]     Ninth Circuit panels have cited, with approval, *Wood*'s holding on this point. *Larson v. United Natural Foods W. Inc.*, 518 F. App'x 589, 591 (9th Cir. 2013) (citing

presents the question whether an employer's duty to reasonably accommodate a disabled employee, who is presently unqualified for the position he holds, includes the obligation to grant the employee an indefinite period of time to correct his disabling condition. We think that such a requirement would contravene the meaning of the phrase 'reasonable accommodation,' as provided in the [ADA]."). *Compare Liu v. DeJoy*, 2023 WL 4203507, *9 (C.D. Cal. 2023) ("Reviewing the evidence in the light most favorable to Liu, a reasonable jury could find that Liu's requested accommodation could plausibly have enabled him adequately to perform his job upon return. USPS cites to several cases to support the proposition that courts have found requests for indefinite or 'long-term' leaves are not reasonable accommodations. Even if binding on this Court, USPS's cases are not applicable. The record does demonstrate that Liu requested indefinite leave, but only six weeks of leave.") (citations omitted).

In this respect, this case is quite similar to *Samper*. There, as here, an employer engaged in "Herculean efforts to accommodate" an employee's disability-driven attendance problems over a period of years, including a "history of extended leaves not counted towards the attendance policy." *Samper*, 675 F.3d at 1240. *See also id.* at 1239 (noting that the employee's "absences had exceeded those permitted under the policy in past years without repercussions"). There, as here, the employer eventually decided to terminate the employee after its various accommodation efforts failed to curb the attendance problems. *Id.* at 1235-36 (noting that after the employer's "flexibility . . . yielded no results," "[m]atters came to a head in 2008"). And there, as here, the employee argued the employer should have offered her a leave of absence as a reasonable accommodation but "never quantified the number of additional unplanned absences she was seeking." *Id.* at 1239 (quotation marks omitted). The Ninth Circuit forcefully rejected the notion that such an accommodation was reasonable: "Samper attempts to gild the lily by claiming . . . that her proposed variation to the attendance policy constitutes a reasonable

---

*Wood* in support of the proposition that "an indefinite, but at least six-month long, leave of absence . . . is not a reasonable accommodation").

accommodation." *Id.  See also id.* at 1240 ("Samper's request so far exceeds the realm of reasonableness that her argument leads to a breakdown in well-established ADA analysis.").  The court elaborated: "[S]uch behavior suggests that the only imaginable accommodation that would satisfy the employee would be an open-ended schedule that would allow her to come and go as she pleased. . . .  [This] stretches the notion of accommodation beyond any reasonable limit.  An accommodation that would allow Samper to simply miss work whenever she felt she needed to and apparently for so long as she felt she needed to as a matter of law is not reasonable on its face." *Id.* at 1239-40 (cleaned up).  So, too, here. *Cf. Rancourt v. OneAZ Credit Union*, 2018 WL 3926491, *3 (D. Ariz. 2018) (citing *Samper* in support of the conclusion that, where "the only reasonable accommodation Plaintiff alleges Defendant denied him . . . is an indefinite extension to his leave from work for medical treatment," such "an indefinite leave of absence as an accommodation is unreasonable as a matter of law"); *Neufeld v. Winco Holdings, Inc.*, 2016 WL 815649, *4 (E.D. Cal. 2016) (citing *Samper* for the proposition that an employer need not "permit its employees to work intermittently as their health necessitates if attendance is one of their essential job duties").  *See also West v. Alaska Airlines, Inc.*, 2020 WL 8175608, *12 (D. Alaska 2020) ("[I]ntermittent, unscheduled medical leave would not have rendered Plaintiff qualified to perform the essential functions of [the] job, which included regular, punctual attendance.").

Separate and apart from the indefinite-duration issue, no reasonable juror could find on this record that yet another leave of absence (of any duration) would have plausibly enabled Plaintiff to begin satisfying the attendance requirement once that leave term was completed.  (Doc. 80-4 at 9 ["So I've been asking for the same accommodation for several years . . . if they had helped me, I probably would have been at work more because I would have had a positive environment where people were trying to help me."].)  Between 2011 and 2014, USPS repeatedly granted Plaintiff's requests for leave, including leave through the FMLA, while Plaintiff sought medical treatment for his underlying health issues.  (Doc. 80-18 at 66 [request for time off under FMLA]; *id.* at 18, 22, 29, 46, 53, 57, 69 [requests

for medical leave].)  Although Plaintiff argues that these prior approvals necessarily show that another term of leave was a reasonable accommodation—"USPS approved leave between 2012 and 2016 consistently.  There is evidence that [leave] in fact did work and provided an effective and proper accommodation" (Doc. 80 at 14-15)—this argument is both legally unsound and factually inaccurate.  As for the law, "[a]n institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law," although such a practice "is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable."  *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 820 (9th Cir. 1999).  *See also Wood*, 323 F.3d at 1314 ("Green previously granted Wood indefinite leaves of absence to deal with his cluster headaches.  However, prior accommodations do not make an accommodation reasonable."); *Flory v. Pinnacle Health Hosp.*, 2008 WL 2782664, *3-4 (M.D. Pa. 2008) (rejecting plaintiff's assertion that her supervisors' earlier practice of allowing her to miss work on inclement-weather days showed that this was a reasonable accommodation: "[They] may have tolerated her absences, but this quasi-estoppel argument does not assist Plaintiff.  Defendant did not have to allow her to continue in the job when she was unqualified.").  As for the facts, it is undisputed that USPS's many past grants of leave were unsuccessful in preventing Plaintiff's future absences.  Indeed, despite USPS's multiple grants of leave to Plaintiff between 2011 and 2014 to address his health issues, Plaintiff incurred *132 days* of unscheduled leave from the beginning of 2015 through May 7, 2016.  (Doc. 77-2 at 106 ["In the year 2015, [Plaintiff] has 97 days of non-FMLA unscheduled absences. . . .  In 2016 through 5/7/16, [Plaintiff] has 35 days of non-FMLA unscheduled absences."].)  This track record undermines any suggestion that yet another grant of leave would have succeeded where the previous grants of leave did not.  *Samper*, 675 F.3d at 1240-41 ("Providence was under no obligation to give Samper a free pass for every unplanned absence.  Importantly, . . .  Providence had already provided her with various accommodations. . . .  Ultimately, despite Providence's patience and accommodations,

there was literally nothing in the record to suggest that the future would look different from the past, leaving Providence with little choice but to terminate Samper.") (citation and internal quotation marks omitted); *Trujillo v. U.S. Postal Serv.*, 330 F. App'x 137, 139 (9th Cir. 2009) ("[E]ven assuming the extensive and unscheduled leave sought beginning in December 1999 was for treatment of depression, Trujillo failed to meet his initial burden of demonstrating that such leave was an accommodation that would, more probably than not, have resulted in his ability to perform the essential functions of his job. . . .  Trujillo had already been granted significant leave time to treat his depression, but such accommodation failed to stem Trujillo's absenteeism.") (cleaned up); *Humphrey*, 239 F.3d at 1136 n.13 ("Of course, the requirement to grant a leave where there are plausible reasons to believe that it would accommodate the employee's disability can not be repeatedly invoked, thus permitting an unqualified employee to avoid termination by requesting a leave of absence each time he is about to be fired."); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 879 n. 10 (9th Cir. 1989) ("[T]he fact that an accommodation has been attempted and was unsuccessful is a relevant consideration for the factfinder and may in fact prove dispositive in determining whether failure to permit subsequent leave constituted failure to make a reasonable accommodation.").  *Cf. Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir. 1990) ("Fuller also contends that he entered a treatment program before his removal became effective and that the Postal Service should have awaited the outcome of this treatment or reinstated him.  While the Postal Service had the option of doing so, reasonable accommodation did not require such an action.  Fuller's previous attempts at recovery had not been successful and there was no guarantee that this one would have been successful either.").

This conclusion is bolstered by the doctors' letters that Plaintiff submitted in support of his earlier leave requests.  Again and again, those letters asserted that Plaintiff would be able to return to work without restrictions, and without the need for future accommodation, following the period of leave.[14]  Those assertions were obviously inaccurate, as Plaintiff's

---

[14]     Doc. 80-18 at 5 (Dr. Hicks's March 22, 2016 letter: "John Chandler . . . may return to full duty with no restrictions."); Doc. 77-2 at 54 (Dr. Hicks's March 3, 2016 letter: "John

chronic absenteeism continued after each of the leave periods and, if anything, accelerated until he was finally terminated in 2016.

The Court acknowledges there is one piece of evidence in the record that might, at first blush, appear to muddy the waters on this issue. In an April 27, 2016 letter to USPS, Dr. Hicks asserted that "Mr. Chandler is improving and his future absenteeism should decline with time." (Doc. 80-5 at 2.) In his response brief, Plaintiff seems to argue that this letter at a minimum creates a jury question about the efficacy of his proposed accommodation of more leave. (Doc. 80 at 3, 12, 14-15.)[15] Any such argument is unavailing. Although an employee is "not require[d] . . . to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation" and only needs "to satisfy the minimal requirement that a leave of absence could plausibly have enabled [him] adequately to perform [his] job," *Humphrey*, 239 F.3d at 1136, Dr. Hicks did not identify any reason to believe that additional medical leave would finally enable Plaintiff to perform his job when the same accommodation had repeatedly failed to achieve that result in the past. *Samper*, 675 F.3d at 1240-41 ("[D]espite Providence's patience and accommodations, there was literally nothing in the record to suggest that the future would look different from the past, leaving Providence with little choice but to terminate Samper.") (cleaned up); *Trujillo*, 330 F. App'x at 139; *Humphrey*, 239 F.3d at

---

Chandler . . . may return to full duty with no restrictions."); *id.* at 48 (Dr. Jasser's February 19, 2016 letter: "He is now cleared to return back to work with no restrictions."); Doc. 80-8 at 8 (Dr. Hicks's May 13, 2015 letter: "He may now return to work . . . full-time without accommodations."); *id.* at 9 (Dr. Hicks's April 3, 2015 letter: "He may now return to work . . . full-time, without accommodations."); *id.* at 10 (Dr. Hicks's March 12, 2015 letter: "He may now return to work . . . full-time, without accommodations."); *id.* at 18 (Dr. Hicks's December 12, 2014 letter: "Mr. Chandler may return to full duty with no restrictions on December 13, 2014. He is able to perform all necessary functions of his job."); *id.* at 22 (Dr. Hicks's August 20, 2014 letter: "Mr. Chandler may return to full duty with no restrictions on August 19, 2014. He is able to perform all necessary functions of his job."); *id.* at 29 (Dr. Hicks's November 1, 2013 letter: "He may return on 11-12-13 full time without restrictions."); *id.* at 53 (October 11, 2012 doctor's note, answering "yes" to "Is Mr. Chander capable of performing all the functions of a letter carrier"); *id.* at 57 (Dr. Jasser's April 25, 2012 letter: "In conclusion, at this point I do believe that John Chandler can return to work and perform the essential function of his job . . . .").

[15]     The Court notes that even if this statement in Dr. Hicks's letter could be viewed as creating a jury question on the issue of the potential *efficacy* of more leave, there would remain the separate problem of the indefinite *duration* of the proposed leave term.

1136 n.13; *Kimbro*, 889 F.2d at 879 n.10; *Fuller*, 916 F.2d at 562.  In a related vein, Dr. Hicks made no effort to reconcile this prediction of future improvement with his many earlier (and inaccurate) assertions that Plaintiff was able to return to work without restrictions and without the need for accommodation.  Dr. Hicks also did not state that the unspecified course of treatment would (or even might) *eliminate* Plaintiff's absenteeism—instead, Dr. Hicks merely stated that the absenteeism "should *decline* with time."  (Doc. 80-5 at 2, emphasis added.)  But even if the absenteeism declined in some unspecified way, Plaintiff would remain unable to consistently perform the essential function of being physically present at work.

Finally, even assuming for the sake of argument that Plaintiff's proposed accommodation of more leave could somehow qualify as a reasonable accommodation, Defendant has satisfied its resulting burden of demonstrating that such an accommodation would have imposed an undue hardship.  Defendant has submitted evidence that "[w]hen an employee is absent, their entire route assignment must be assigned to other letter carriers to complete," which "results in those employees working additional time during the day, and the USPS incurring costs for overtime and penalty overtime pay" as well as "less efficient performance and non-consistent delivery times to our customers."  (Doc. 77-2 at 9 ¶ 36.)  USPS repeatedly advised Plaintiff of those burdens in the warning letters.  (*Id.* at 17 ["When you are absent, your duties must be assigned to others, causing the Postal Service additional expense as well as disruption to the operation.  Your continuing failure to notify me of your status interferes with my ability to properly plan to meet operational needs."].)

Plaintiff's argument in response—that granting leave would not impose an undue hardship because USPS previously allowed him to take FMLA leave (Doc. 80 at 14-16)—is unavailing because it conflates the distinct regulatory frameworks created by the ADA and FMLA.  *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481-82 (7th Cir. 2017) ("Long-term medical leave is the domain of the FMLA, which . . . protects up to 12 weeks of medical leave, recognizing that employees will sometimes be unable to perform their

job duties due to a serious health condition.  In contrast, the ADA applies only to those who can do the job. . . .  If, as the EEOC argues, employees are entitled to extended time off as a reasonable accommodation, the ADA is transformed into a medical-leave statute—in effect, an open-ended extension of the FMLA.  That's an untenable interpretation of the term 'reasonable accommodation.'") (citations omitted); 29 C.F.R. § 825.702(a) (noting that "[n]othing in FMLA modifies or affects any Federal or State law prohibiting discrimination on the basis of . . . disability," that the "FMLA is not intended to modify or affect the Rehabilitation Act of 1973," and that "leave provisions of the FMLA are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA") (cleaned up).[16]  Further, allowing even a time-limited leave of absence would impose an undue burden on Defendant because it would require other employees to shoulder the burden of Plaintiff's mail route, and as a result, USPS would have to pay those employees overtime and previously scheduled mail routes would be disrupted.  *Cf. Yonemoto v. McDonald*, 114 F. Supp. 3d 1067, 1120 (D. Haw. 2015), *aff'd sub nom. Yonemoto v. Shulkin*, 725 F. App'x 482 (9th Cir. 2018) ("Defendant has established by a preponderance of the credible evidence that having to address the additional complaints from employees and the 'barrage' of questions from Plaintiff that additional work would create would have imposed an undue hardship on Defendant."); *Kimbro*, 889 F.2d at 878 n.8 ("ARCO's legitimate need to schedule all machinist projects in advance made it unreasonable to require ARCO to permit a disabled employee such as Kimbro to use unexhausted sick leave days intermittently on days or hours when his migraine condition precluded his ability to work."); *Davis v. Burwell*, 2016 WL 51246, *5 (D. Ariz. 2016) ("Plaintiff's physical limitations precluded the performance of such a demanding job

---

[16]     During oral argument, Plaintiff seemed to state that he was requesting a reasonable accommodation of 12 weeks of intermittent leave consistent with the leave limit under the FMLA.  As discussed above, this approach is misguided because it conflates distinct regulatory frameworks that serve different purposes.  29 C.F.R. § 825.702(a).  Additionally, Plaintiff was not entitled to 12 weeks of leave under the FMLA because he had not worked enough hours to qualify for FMLA leave.  (Doc. 77-2 at 50 [email from Gronowski regarding Plaintiff's FMLA status].)  Thus, deeming this request reasonable would circumvent the requirements of the FMLA.  *Severson*, 872 F.3d at 481-82.

function.  That the reallocation of functions suggested by Plaintiff would result in an inefficient and delayed delivery of service is also undisputed.  Plaintiff's request that another civil engineering technician assist him in performing the essential functions of his job also would result in a delay of service to families.").

### iii.   Part-Time Employment

Plaintiff's next proffered accommodation, part-time employment, is not a reasonable accommodation in this context.  As an initial matter, Plaintiff does not point to any evidence that a reduced work schedule or temporary part-time employment would plausibly have enabled him adequately to perform his job.  His problem wasn't that he could only remain at work for part of his assigned shift—it was that he was unable to come to work at all.[17]

At any rate, USPS had no obligation under the Rehabilitation Act to create a part-time City Letter Carrier position for Plaintiff.  *Federico v. Donahoe*, 2013 WL 3991818, *5 (D. Ariz. 2013) ("[A]n employer does not have a duty to create a new job for the disabled employee."); *Shiring*, 90 F.3d at  831 ("[U]nder the Act employers are not required to create positions specifically for the handicapped employee."); *Brown*, 2019 WL 13251354 at *11 ("[Plaintiff] argues that there are several other accommodations that would enable her to perform the essential functions of the job of letter carrier, such as . . . part-time or

---

[17]    Plaintiff's post-USPS employment—although not identified by Plaintiff as support for his request for part-time employment—does nothing to change this analysis.  Plaintiff was unemployed for around three years after being terminated by USPS, then worked from 2019 through mid-2020 at Arizona Jobbers Supply as a "[w]arehouse clerk and delivery driver." (Doc. 80-4 at 3-4.)  In this role, Plaintiff did not recall taking unscheduled leave or being disciplined for absences.  (*Id.* at 4-5.)  When Arizona Jobbers Supply closed, Plaintiff worked for Walmart as a part-time customer service agent until he was let go because he incurred too many absences.  (*Id.* at 5 [describing being terminated by Walmart because of his absences due to COVID and a car accident].)  While working at Walmart, Plaintiff also had a primary job at TriVita.  (*Id.*)  Even when viewed in a light most favorable to Plaintiff, this post-termination employment history does not show that a part-time schedule would have enabled Plaintiff to maintain consistent attendance at USPS— he was unemployed for three years after his termination and was then terminated for absenteeism from a subsequent part-time job.  *Boone v. Bd. of Governors of Univ. of N. Carolina*, 395 F. Supp. 3d 657, 672 (M.D.N.C. 2019), *aff'd*, 858 F. App'x 622 (4th Cir. 2021) ("Although Plaintiff points to her work history since her termination, her current position of working part-time at UPS does not provide any support to her contention that she would have been able to return to her old position as a police officer at UNC at any specific time.").

modified schedules, . . . [but] none of the examples of reasonable accommodations Plaintiff provides constitutes a reasonable accommodation that would have allowed her to perform the essential functions of her position, as recognized by the Rehabilitation Act.  Although a reasonable accommodation can include job 'restructuring,' this mechanism contemplates only the reallocation of marginal, non-essential functions. . . .  [A] 'part-time' schedule would have required the reallocation of essential functions to other employees and does not constitute a reasonable accommodation.") (internal citations omitted).

iv.   <u>Support</u>

In his deposition, Plaintiff seemingly asserted that he should have received an accommodation of "support" from USPS—"if I had support of work, like I said, maybe I would have called in and talked to Galen the supervisor that actually was a nice guy, and maybe we would have had a hypothetical conversation where he would have helped me out and I would have went to work.  You know, having that help that I was asking for and then—you know, knowing that I wasn't going to get fired for being ill would have helped me get better sooner. . . .  But having somebody that's supportive and not feeling like you're going to be fired, and that's their only interest since they're not doing what they're supposed to do."  (Doc. 80-4 at 9.)  Plaintiff further clarified that his request for USPS to be more "supportive" meant USPS "[d]oing what they were supposed to do. . . .  Being interactive, trying to figure it out—how . . . somebody suffering with [a] terrible . . . condition, how can we get them, so they can . . . be there at work more often because that's—the ultimate goal, they wanted me to go to work more often—be at work, you know, consistently."  (*Id.* at 12.)

Once again, Plaintiff fails to provide evidence that more "support" from USPS would have plausibly enabled him to return to work.  (*Id.* at 10 ["[N]ot feeling like I was going to be fired would help my emotional state."].)  Plaintiff's statements that support would have "maybe" encouraged him to call USPS or go to work are speculative and not supported by the record.

Indeed, the record undermines any suggestion that USPS failed to provide support

to Plaintiff in the face of his chronic absenteeism.  As noted, USPS granted Plaintiff extensive FMLA and non-FMLA leave between 2011 and 2014 to address his underlying health issues.  (Doc. 80-18 at 18, 22, 29, 46, 53, 57, 66, 69.)  When Plaintiff ran out of FMLA leave but continued to take unscheduled leave, USPS sent Plaintiff warning letters providing him with an opportunity to explain his absences at fact-finding hearings.  (*See, e.g.*, Doc. 77-2 at 36 [January 28, 2016 letter]; *id.* at 38 [notification of February 6, 2016 fact-finding]; *id.* at 46 [notification of March 2, 2016 fact-finding].)  Plaintiff did not attend those hearings.  (*See, e.g.*, *id.* at 46 [noting Plaintiff did not appear for the February 6, 2016 fact-finding or call Holsome-Benion; *id.* at 68 [noting Plaintiff did not appear for the March 2, 2016 fact-finding or call Holsome-Benion].)  USPS also excused Plaintiff's absences when he provided adequate medical documentation.  (*Id.* at 10 ¶ 40 ["Management approved Mr. Chandler's request for scheduled sick leave from February 9, 2016 to February 13, 2016 because he had submitted a request in advance on December 15, 2015, and this absence was not cited in the notice of removal.  Mr. Chandler's request for accommodation for his unscheduled absences of March 9, 2016, March 10, 2016, March 30, 2016 and March 31, 2016 were also approved as unscheduled absences."].)  Additionally, when Plaintiff's medical documentation released Plaintiff to return to work with no restrictions yet Plaintiff continued to miss work, USPS asked Plaintiff to provide additional medical documentation excusing his absences.  (Doc. 80-7 at 2.)  Plaintiff did not provide that documentation when requested.  Only after all of this—the FMLA leave, continued absences, multiple warning letters and fact-findings, failures to appear at fact-findings, and unanswered or delayed requests for medical documentation—did USPS send Plaintiff a termination letter.  (Doc. 77-2 at 67-69.)

Finally, Plaintiff's "support" argument also lacks merit because it conflates distinct steps of the analysis under the ADA and Rehabilitation Act.  At bottom, Plaintiff's argument seems to be that USPS's failure to engage in a fulsome interactive process in 2016 was the missing piece of "support" he needed.  But as discussed in more detail in Part II.B below, the interactive process is a mechanism for *identifying* a reasonable

accommodation—it is not, itself, *the* reasonable accommodation.  When an employer fails to engage in the interactive process, this may make it easier for a plaintiff to prevail, but it does not eliminate the need to determine whether a reasonable accommodation was possible.  *Snapp*, 889 F.3d at 1095 ("[T]here exists no stand-alone claim for failing to engage in the interactive process.  Rather, discrimination results from denying an available and reasonable accommodation.").  Plaintiff's "support" theory ignores this principle.

### B.   Discrimination Because Of A Disability

Although Defendant is entitled to summary judgment in light of the conclusions reached in Part II.A above, the Court will complete the later steps of the Rehabilitation Act analysis in an abundance of caution and in effort to create a complete record in the event of appeal.

### 1.   The Parties' Arguments

Defendant argues that "Plaintiff's Rehab Act claim also fails because he cannot establish that USPS discriminated against him by failing to engage in the interactive process to identify, or otherwise provide him with, a reasonable accommodation." (Doc. 77 at 13.)  Specifically, Defendant argues that "USPS did in fact engage in the interactive process and Mr. Chandler's failure to respond with updated medical documentation was the reason for the breakdown."  (*Id.*)  According to Defendant, Plaintiff was responsible for a breakdown in communication because he "never responded" to Holsome-Benion's request on March 2, 2016 for additional medical documentation "with sufficient updated medical documentation to support a need for ongoing accommodation."  (*Id.* at 13-14.)

Plaintiff responds, with less than ideal clarity, that he "has set forth more than sufficient facts for a trier of fact to determine he was discriminated against."  (Doc. 80 at 12.)  Plaintiff argues that USPS had a duty to engage in an interactive process with him to find a reasonable accommodation and that although he "did cooperate" in this process, USPS did not.  (*Id.* at 12-13.)  Plaintiff argues that he engaged in the interactive process because he "made over a dozen requests for a reasonable accommodation, and on at least ten of these occasions USPS management did not follow proper policies or procedures."

(*Id.*)   Plaintiff also argues that his "fail[ure] to respond with updated medical documentation" does not "release[] USPS of its duty."  (*Id.* at 12.)  Plaintiff argues that "USPS'[s] failure to even discuss reasonable accommodation is discriminatory on its face as is the termination.  A jury could find the termination would not have happened if there had been reasonable accommodation."  (*Id.* at 9.  *See also id.* at 13 ["There was no thorough, fact specific, investigation or interactive process or analysis by the supervisor who made the decisions."].)[18]

In reply, Defendant essentially reiterates some of the arguments from the motion for summary judgment, specifically (1) "Plaintiff does not give any indication that his need for time off to heal or intermittent leave is limited in any way or, that given the episodic nature of his disability, any such leave could be planned in advance . . . [and] is therefore unreasonable as a matter of law under *Samper*"; and (2) Plaintiff's requested accommodations would cause undue hardship.  (Doc. 83 at 5-6.)

2.   Analysis

Whether Plaintiff suffered discrimination because of his disability overlaps with the "qualified individual" analysis set forth in Part II.A above.  *Yonemoto*, 114 F. Supp. 3d at 1113 ("Where the plaintiff's Rehabilitation Act claim is based on a denial of reasonable accommodation, the inquiry of whether the plaintiff can perform the essential functions with or without reasonable accommodation appears to largely overlap the third element of the plaintiff's claim—*i.e.*, that the plaintiff establish that he suffered discrimination on the basis of disability through the defendant's denial of reasonable accommodation.  Indeed, although there may be factual scenarios that call for distinct inquiries, whether the plaintiff can perform the essential functions of a position with or without reasonable

---

[18]   Plaintiff also argues that an unemployment-benefits decision by the Arizona Department of Economic Security ("DES") "at a minimum, raises serious questions that require an evidentiary hearing and preclude summary judgment."  (*Id.* at 3.)  This argument is unavailing.  DES addressed the narrow issue whether Plaintiff "was discharged from his employment for reasons other than wilful or negligent misconduct."  (Doc. 80-19 at 2.)  Although DES resolved that issue in Plaintiff's favor—"The employer has not met its burden of proving the claimant was discharged for misconduct in connection with the employment" (Doc. 80-19 at 8)—that determination does not control the issues presented here.

accommodation and whether the plaintiff was denied reasonable accommodation are both generally directed to the heart of a reasonable accommodation dispute.").

An employer engages in unlawful discrimination in violation of the Rehabilitation Act by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

As discussed above, "[t]he Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee."  *Snapp*, 889 F.3d at 1095.  "The interactive process *requires* *both* the employer *and* the employee to engage in good faith in order to clarify what the individual needs and identify the appropriate accommodation."  *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (internal quotation marks and citation omitted, emphasis in original).  *See also id.* (the employee's participation is "important" because the employee "generally knows more about his or her capabilities, and 'holds essential information for the assessment of the type of reasonable accommodation which would be most effective'") (citation omitted).  Thus, "[a]n employer does not have a duty . . . to engage in further interactive processes . . . in the absence of requested medical evidence."  *Garcia v. Salvation Army*, 918 F.3d 997, 1010 (9th Cir. 2019) (cleaned up).  *See also Allen v. Pac. Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003) ("Because Allen failed to cooperate in the job-search process [by failing to appear for required tests to qualify for certain jobs], we cannot say that Pacific Bell failed to fulfill its interactive duty.");  *Reza v. Int'l Game Tech.*, 351 F. App'x 188, 190 n.2 (9th Cir. 2009) ("[A]s Reza failed to provide medical evidence supporting her new 'smells' condition, IGT was not required to engage in further interactive processes, and Reza was not entitled to accommodation under the ADA.");  *Hill*,

162 F. Supp. 3d at 928 ("An employer is not subject to liability on this theory, however, if the employee was responsible for the breakdown in the process.").

Alternatively, if the employer bears responsibility for the breakdown of the interactive process, this does not necessarily result in liability.  "[T]here exists no stand-alone claim for failing to engage in the interactive process"—rather, "if an employer fails to engage in good faith in the interactive process," the consequence is simply that "the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Snapp*, 889 F.3d at 1095.[19]

### a. **Interactive Process**

An initial complication in analyzing the sufficiency of the interactive process here is that although Plaintiff took many steps over the years that each could be viewed as triggering Defendant's obligation to engage in an interactive process—including sending a letter to the FMLA coordinator on December 7, 2011 providing notice of his PTSD (Doc. 80-11); submitting a December 30, 2014 letter from Dr. Hicks that included an express request for an "accommodation [of] . . . time [Plaintiff] needed off work in order to get well from his issues" (Doc. 80-18 at 11); making an express request for "a reasonable accommodation" during a fact-finding hearing on May 13, 2015 (Doc. 80-22 at 5); making another express "request for a reasonable accommodation for my disability" in his March 2, 2016 email to Holsome-Benion and others (Doc. 80-6 at 2); submitting a notification form on April 4, 2016 that included the phrase "Request ADA accommodation [sic] for

---

[19]   During oral argument, Plaintiff seemed to argue that an inference of discrimination should arise from USPS's failure to follow its own rules related to the interactive process (*e.g.*, not sending Plaintiff's reasonable accommodation requests to the DRAC).  This argument lacks merit.  As noted, the consequence for failing to engage in the interactive process is a burden shift regarding the availability of a reasonable accommodation.  The cases cited by Plaintiff (via a post-oral argument email to chambers) are not to the contrary. Those cases—*Finley v. United Parcel Serv. Inc.*, 2018 WL 6422082 (D. Ariz. 2018), and *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108 (9th Cir. 2011)—address the analysis of causation and pretext in retaliation cases, not how to identify whether a reasonable accommodation existed in an ADA/Rehabilitation Act case.  *Earl*, 658 F.3d at 1118 ("Earl did not present any disability discrimination arguments in either her opening or reply brief and has waived any appeal of the district court's decision on that claim.  We therefore affirm the district court's grant of summary judgment on Earl's disability discrimination claim.") (internal citation omitted).

disability" (Doc. 80-15 at 9); and submitting Dr. Hicks's April 27, 2016 letter, which stated that Plaintiff should "be given an accommodation for the time off he needs to recover" (Doc. 80-5)[20]—the Court previously determined that Plaintiff's complaint must be interpreted as challenging only certain acts that occurred on or after February 19, 2016. (Doc. 18 at 13, 21.)

At any rate, regardless of which timeframe is used, a reasonable jury could conclude, when all disputes of fact are resolved in Plaintiff's favor, that USPS was responsible for the breakdown in the interactive process. This is true even though USPS made many overtures to Plaintiff between 2011 and 2016, including providing Plaintiff with FMLA leave and other medical leave, warning Plaintiff that his absences could lead to termination, and giving Plaintiff many opportunities to explain his absences at fact-findings and provide updated medical documentation. Defendant places heavy emphasis on Plaintiff's initial failure to produce medical documentation in response to Holsome-Benion's March 9, 2016 request (Doc. 80-7), but it is undisputed that Plaintiff eventually provided such documentation—the April 27, 2016 letter from Dr. Hicks (Doc. 80-5)—before the termination decision went into effect. *Cf. Kimbro*, 889 F.2d at 878 ("As long as at the time of Kimbro's termination, there were plausible reasons to believe that the handicap could have been accommodated by a leave of absence, ARCO is responsible for its failure to offer such a leave.") (cleaned up). USPS did not engage in an interactive process with Plaintiff after receiving Dr. Hicks's letter and instead moved forward with Plaintiff's termination. Accordingly, viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could conclude that Defendant was responsible for failing to continue engaging in an interactive process.

b.     **Reasonable Accommodation**

Given this conclusion, the burden falls on Defendant to demonstrate that no reasonable accommodation existed that would have allowed Plaintiff to perform the

---

[20]     During oral argument, Plaintiff argued that USPS did not engage in *any* interactive process, but that argument is contradicted by the record, which identifies numerous attempts by USPS to discuss Plaintiff's absences with him.

essential functions of his job.

Defendant has satisfied that burden for the reasons discussed in Part II.A.2.b above. All of Plaintiff's proffered accommodations are unreasonable or would have, at a minimum, imposed an undue burden on USPS. The Court also agrees with Defendant (Doc. 77 at 15) that there were no other potential accommodations, beyond those identified by Plaintiff, that might have qualified as reasonable accommodations. *Johns v. Brennan*, 761 F. App'x 742, 747-48 (9th Cir. 2019) (suggesting that courts may look beyond the accommodations proffered by the plaintiff when the burden has shifted to the defendant due to an interactive-process failure: "[E]ven if Johns's request to box mail at the Sutter Creek Post Office is an unreasonable accommodation, the Postal Service has not demonstrated that there were no other [potential accommodations].").

For example, job restructuring may sometimes serve as a reasonable accommodation. *Hayes v. Potter*, 2006 WL 8448504, *4 (N.D. Cal. 2006) ("The ADA specifically mentions job restructuring as a type of reasonable accommodation under the ADA.") (citation omitted). However, restructuring was not an option here. Plaintiff's job as a City Letter Carrier required his attendance at work to deliver mail, yet Plaintiff's disability prevented him from leaving the house. (Doc. 80-4 at 7 ["There's symptoms that you can't see going on inside like this. Just inability to function, fear of communication, fear of not being able to control your actions. Agoraphobia, where at—sometimes like I couldn't get out of the house. I felt like I was just a prisoner looking outside. Of course, you know, the lack of sleep, sometimes not showering, shaving, et cetera."].) Even a light-duty version of the City Letter Carrier position would require attendance. Removing the in-person component of the City Letter Carrier position would also be unreasonable because it would change the essential function of the position, to deliver mail. That kind of restructuring is not required by the Rehabilitation Act. *Brown*, 2019 WL 13251354 at *11; *Hayes*, 2006 WL 8448504 at *4.

Another potential reasonable accommodation is reassignment to a vacant position. *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000) ("Under Title I of the ADA, a

reasonable accommodation includes reassignment to a vacant position.  Similarly, the regulations implementing the Rehabilitation Act provide that an agency's duty of reasonable accommodation includes, in certain circumstances, the duty to reassign an employee to a vacant position . . . .") (citations omitted).  However, the only evidence in the record bearing on the job responsibilities associated with other positions within the USPS—the ELM—states that regular attendance is also a requirement of those positions. (Doc. 77-2 at 25.)  Thus, even assuming there may have been other vacant USPS positions, reassignment would not have been a reasonable accommodation given that Plaintiff's disability prevented him from leaving the house.  Nor was USPS obligated to create a new position that eschews the attendance requirement.  *Brown*, 2019 WL 13251354 at *11; *Federico*, 2013 WL 3991818 at *5.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 77) is **granted**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 31st day of January, 2024.

Dominic W. Lanza
United States District Judge